## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TECHNO VIEW IP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Case No. _____ |
| v. | ) | |
| | ) | |
| OCULUS VR, LLC, and | ) | **JURY TRIAL DEMANDED** |
| FACEBOOK, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## COMPLAINT

Plaintiff Techno View IP, Inc. brings this action against Defendants Oculus VR, LLC and Facebook, Inc. (collectively "Defendants"), and alleges the following:

## THE PARTIES

1.      Plaintiff Techno View IP, Inc. ("TVIP," also known as "TechnoView IP Inc.") is a corporation organized and doing business under the laws of the State of California.

2.      Plaintiff TVIP is the exclusive licensee of U.S. Patent No. 7,666,096, and has the full and exclusive right to pursue this lawsuit based on infringement of Patent No. 7,666,096.

3.      Defendant Oculus VR, LLC ("Oculus") is a limited liability company organized and doing business under the laws of the State of Delaware.

4.      Upon information and belief, Defendant Oculus VR, LLC is the corporate successor of Oculus VR, Inc., which was a Delaware corporation, and of Oculus VR, Inc.'s predecessor company, Oculus LLC, which was a California limited liability company.

5.      Defendant Oculus may be served with process by service upon its registered agent: Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware.

6.      Upon information and belief, Defendant Oculus has its principal place of business

located at 1601 Willow Road, Menlo Park, California, which is also believed to be the corporate headquarters of Facebook, Inc.

7.      Upon information and belief, Defendant Oculus is a wholly owned subsidiary of Defendant Facebook, Inc.

8.      Defendant Facebook, Inc. ("Facebook") is a corporation organized and doing business under the laws of the State of Delaware.

9.      Defendant Facebook, Inc. may be served with process by service upon its registered agent:  Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware.

10.      Upon information and belief, Defendant Facebook has its principal place of business located at 1601 Willow Road, Menlo Park, California.

## JURISDICTION AND VENUE

11.      This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 271, *et seq*.

12.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

13.      This Court has personal jurisdiction over Defendants at least because Defendant Oculus VR, LLC and Defendant Facebook, Inc. are Delaware companies.

14.      Venue in this district is proper pursuant to 28 U.S.C. §§ 1391(c) and (d), and 1400(b).

## BACKGROUND

15.      This suit alleges infringement by Defendants of Plaintiff TVIP's exclusive ownership of all substantial rights to a patent, specifically U.S. Patent No. 7,666,096 (hereinafter

the "'096 Patent").

16.     The '096 Patent is entitled "METHOD FOR GENERATING THE LEFT AND RIGHT PERSPECTIVES IN A 3D VIDEOGAME." The '096 Patent describes systems and methods to dynamically process left and right video images in a stereoscopic videogame environment. The '096 is part of a family of patents that also includes U.S. Patent No. 8,206,218 entitled "3D VIDEOGAME SYSTEM" (hereinafter the "'218 Patent") and U.S. Patent No. 9,503,742 entitled "SYSTEM AND METHOD FOR DECODING 3D STEREOSCOPIC DIGITAL VIDEO" (hereinafter the "'742 Patent").

17.     TVIP reserves the right to amend this Complaint to include infringement of the '218 Patent and '742 Patent, when and if the evidence supporting such amendment is confirmed by TVIP.

18.     The '096 Patent is a continuation of an application originally filed in Mexico as Patent Cooperation Treaty ("PCT") PCT/MX2003/00112 on Dec. 19, 2003. The '218 Patent is a continuation of the '096 Patent. The '742 Patent is a continuation of US Patent Application No. 11/510,262, filed on August 25, 2006, which is a continuation of Application No. PCT/MX2004/000012, filed on February 27, 2004.

19.     Manuel Rafael Gutierrez Novelo is the inventor of the technology and CEO of TDVision Systems, Inc. (Irvine, CA), hereinafter "TDVision." ImmersiON-VRelia USA (Redwood City, CA) operates as a subsidiary of TDVision, hereinafter "ImmersiON-VRelia." Products incorporating the patented technologies are manufactured by ImmersiON-VRelia through subsidiaries and contract manufacturers in USA, Europe, Mexico, and China. These products include different types of head-mounted displays for consumers. One product even received a "2016 Best of CES Award" as the best designed virtual reality ("VR") headset.

20.     Mr. Novelo, inventor of the technology and sole inventor listed on the '096, '218, and '742 Patents, is CEO of TDVision and ImmersiON-VRelia, as well as CEO of the various subsidiaries in Europe, Mexico and China responsible for manufacturing the products.  Mr. Novelo also invented and patented a related technology known as the "2D plus Delta Codec."  In 2008, prior to the issuance of his patents, Mr. Novelo voluntarily declared the pending patent applications as essential to the 3D encoding section of the H.264 Standard promulgated by the International Telecommunications Union ("ITU"), the International Standards Organization (ISO), and the International Electrotechnical Commission ("IEC").  His "Patent Statement Declaration" to the ITU, (registered as "J180-01") ("declaration"[1]) stated that TDVision "… is prepared to grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions…."  Mr. Novelo did not insist on reciprocal cross-licenses as a condition for a license.

21.     This technology was subsequently adopted by the ITU and renamed the MultiView Codec ("MVC") as part of its H.264 and ISO/IEC 14496-10 specifications.  The 2010 dated release of the corresponding specification lists TDVision's voluntary declaration on page 410.

22.     The MVC (or "2D+Delta Codec") functions by taking advantage of redundancies between multiple video frames or image views.  In December 2009, the Blu-ray Disc Association ("BDA") announced the incorporation of MVC into the standard specification for 3D Blu-ray movies and Blu-ray players worldwide.  This is significant because the industry wanted assurance that a new 3D disc would play a 2D version of the movie, if inserted into an older 2D Blu-ray player or if connected to a 2D display.  The BDA conducted independent tests and

---

[1] Please see: http://www.itu.int/net4/ipr/details_ps.aspx?sector=ITU-T&id=J180-01

determined that TDVision had the only solution that maintained full Blu-Ray resolution while allowing 3D discs to function in a 2D player.

23.     The prestigious 2013 Lumiere™ Award from the Advanced Imaging Society / International 3D Society was awarded to TDVision and Mr. Novelo for the development of the 2D + Delta Codec.  In 2015, the same MVC technology was made an extension to the new High Efficiency Video Coding ("HEVC") specification, also known as "H.265."

24.     TVIP has agreed to honor TDVision's declaration by licensing any claims that read on the H.264 and ISO/IEC 14496-10 specifications on fair, reasonable, and non-discriminatory ("FRAND") terms.  However, and as the Court in "In re Innovatio" has previously established, a defendant has the burden to prove which claims of a patent, if any, are essential to the relevant standard [see "*In re Innovatio IP Ventures, LLC Patent Litigation* (MDL), 2013 WL 3874042 (N. D. Ill. July 26, 2013)], and claims not proven essential are not subject to FRAND terms.

25.     As often happens in patent prosecution at the US Patent Office, prior to issuance, claims are modified to meet requirements from the patent examiners.  With respect to TDVision's US Patents, TVIP performed an analysis of all the TDVision US patent claims (as well as the foreign patent claims).  TVIP has determined that Claim 1 of the '742 Patent reads on the H.264 and ISO/IEC 14496-10 specifications.  TVIP has also determined that some, but not all, TDVision patents filed in foreign jurisdictions also read on the H.264 and ISO/IEC 14496-10 specifications.

26.     In this Complaint, the '742 US Patent is not being asserted.  However, TVIP reserves the right to amend this Complaint to assert the infringement of the '742 Patent, if the evidence supports such refiling.  In the event that the '742 Patent is believed to be infringed,

prior to  filing any infringement action in the US, TVIP will make a separate FRAND offer to license that claim (there is only one claim in US Patent '742) and the foreign counterparts that also read on the H.264 and ISO/IEC 14496-10 specifications.  If such FRAND offer is accepted, the '742 Patent and its foreign counterparts will not be asserted against the Defendants in the US or the relevant foreign jurisdictions.  The FRAND offer, if one is made, will not be contingent upon the settlement or outcome of this Complaint.  Rather, it will be an unlinked, separate agreement that also covers foreign jurisdictions, and no reciprocal cross-license will be requested or required.  TVIP believes that this structure meets with the intent of TDVision when the original patent declaration was made to ITU/ISO/IEC.

27.     In terms of a broad overview, the '096 Patent describes and claims, systems, and methods for creating and controlling a 3-dimensional image in a videogame system that may be used in a head-mounted display ("HMD"), such as the Defendants' Oculus Rift and Gear products.  The patented technologies perform many functions including, but not limited to, the conversion of 2-dimensional images to 3-dimensional images; faster execution of gaming software through data compression of redundant images; faster data transmission of virtual image data from a PC or other device external to the HMD; more effective use of HMD-related imaging buffers that temporally hold frames of video data; display of the 3-dimensional images on a single 3D display device or multiple 2D display devices (typically, one for each eye); dynamic control of image convergence between left and right eye-view; and, the related processing.  The patented technologies provide for systems and methods to facilitate the efficient application of the various camera angles necessary for the effective display of images in a manner that creates a realistic 3-dimensional perspective to the user while minimizing the potential for nausea, disorientation, and dizziness, which are common side-effects associated

with the use of virtual reality headsets, including those manufactured and sold by the Defendants.

## CAUSE OF ACTION

### INFRINGEMENT OF U.S. PATENT 7,666,096

28.     On February 23, 2010, U.S. Patent No. 7,666,096 ("the '096 Patent") was issued to Manuel Rafael Gutierrez Novelo as the sole inventor thereof.  A true and correct copy of the '096 Patent, which is entitled "Method for Generating the Left and Right Perspective in a 3D Videogame" is attached hereto as Exhibit "A."

29.     Defendants have previously infringed, and do continue to infringe, the '096 patent in violation of 35 U.S.C. § 271, including Claims 1 through 19.

30.     Purely as an example to place Defendants on notice of at least one exemplary product that infringes at least one claim of the '096 Patent, and without limiting further allegations of additional claims infringed by additional products of Defendants, Plaintiff TVIP identifies Claim 16 of the '096 Patent as an exemplary claim that was and is infringed by Defendants using at least Defendants' exemplary product, the Oculus Rift, in at least the following exemplary manner:

        a)      Defendants make, use, offer to sell, and sell their Oculus Rift product, which comprises at least "a videogame system comprising a processor configured to run instructions that when executed perform a method comprising the steps of" at least Claim 16 of the '096 Patent.  TVIP acknowledges that other manufacturers may build the personal computers ("PC" or "PCs") and graphic processing units ("GPU") used to drive the dual video screens in the Rift.  However, upon information and belief, Defendants tightly control the configuration and capabilities of both the PCs and the related virtual reality video games for the Rift.  Defendants exert this control through the various development and market requirements to attain "Oculus-

7

certified" status.  The "Oculus-certified" hardware program and software development programs

provide detailed requirements for the PC and GPU manufacturers.  The programs require testing

and approval by Defendants to ensure compliance with their requirements.  The ability to enjoy

the use of Defendants products is further controlled through their enforcement program, known

as "Oculus Keys."  The issuance or sale of the "Oculus Keys" is required for the use of hardware

and software with the Rift.  Without a key, the Rift will not function, and is essentially a

worthless "brick."

Defendants financially benefit through the co-marketing of "Oculus-certified" PCs, joint

sales of bundles which include the Oculus Rift combined with certified PCs, and sales of 3D and

virtual reality software through the "Oculus Store" in a manner that is profitable to Defendants.

Further, no software will function with the Oculus Rift unless it incorporates special codes and

features as detailed in the Oculus Developer SDK and related developer documentation.

Developers and manufacturers *must* agree to limitations in terms of their access to hardware

features and content deemed appropriate by Defendants before such codes are activated by

Defendants.  Even further, when software or hardware is manufactured by a third-party, it *must*

first be submitted to Defendants for approval before the third-party can access important features

in the Oculus Rift.

A user's beneficial use of Defendants' Oculus Rift product is conditioned on the manner

and timing of that use through access to relevant software programs.  Defendants control the

manner in which third-party products are manufactured, configured, or used in conjunction with

software for the Rift HMD.  One manner in which Oculus does this is through the controlled

distribution of "Oculus Keys."  If the product is sold through the Oculus Store, Defendants

benefit financially and require that:  "*Your apps still needs to be reviewed before we approve you*

*for Oculus keys."*[2]  (Emphasis added)   Similarly, if the product is sold through a third-party off-platform distribution system, Defendants retain control through *requirements* that limit access to the full and open enjoyment of all features by end-users.  "*Off-platform builds must still meet our SDK license requirements.  In particular, all reserved functions called out in the SDK license, such as home button functionality and menu operation, must be respected.*"[3]  (Emphasis added)  Furthermore, software is subject to a mandatory review by Defendants:

> "All apps on the Oculus Store *must* meet certain criteria.  Our mission is to make our platform as frictionless and transparent to developers as humanly possible.  We do not want to be too prescriptive or to present a long list of rules.  That said, <u>*there is a content policy and minimum set of technical requirements your app must meet or exceed*</u>.  <u>*Our decision to publish your app in our Oculus Store rests both on these requirements and on our opinion*</u> about how your app enriches the VR ecosystem as a whole."  [4] (Emphasis added)

Defendants further share their control with a content bifurcation between Oculus and Facebook, as stated in their guidelines:

> "*Unique, high-quality 360-degree videos are welcome, especially if they're interactive.  If your app is primarily video, consider integrating spatialized audio.  We generally do not accept applications that only present a small number of 2D videos, nor apps that are a wrapper for a single 360 video. Also consider that Facebook itself has a growing 360 video platform at*

---

[2] see https://developer3.oculus.com/documentation/platform/latest/concepts/dg-cc-keys/

[3] see https://developer3.oculus.com/documentation/platform/latest/concepts/dg-cc-keys/

[4] see https://developer3.oculus.com/documentation/publish/latest/concepts/publish-prep-app/

https://www.facebook.com/facebookmedia/get-started/360."[5]

Lastly, Defendants control and protect their revenue stream by requiring the use of the "Oculus

Store" billing platform:

> "Apps in the Oculus Store _must not contain other platforms or commerce_
>
> _solutions_. If your app has in-app purchases and you want to distribute in the
>
> Oculus Store, you _must use the Platform SDK to handle billing_. Apps distributed
>
> outside of our Store may use their own commerce systems."[6]  (Emphasis added)

TVIP applauds the social responsibility and business acumen of Defendants with regard to these

content and business matters.  However, these very same requirements provide irrefutable

evidence that Defendants are fully in control of the entire hardware and software ecosystem

surrounding their products.  The repeated use of the term "_must_" by Defendants makes it clear

that the Defendants are the controlling masterminds.  Therefore, in light of such rigid and

unilateral control, TVIP asserts that Defendants meet or exceed the threshold required for direct

infringement, even if the use of third-party products is required for the fulfillment of certain

claim elements or steps.

 b) Oculus Rift "open[s] first and second buffers in a memory of the

videogame system," as required by Claim 16, such as through use of relevant commands in the

freely available Microsoft DirectX or OpenGL software libraries, which creates a first buffer

identified as a "mono or left eye view [buffer]," and a second buffer identified as a "right eye

buffer."  These Microsoft and Open Source commands are further linked to Defendants via the

---

[5] see  https://developer3.oculus.com/documentation/publish/latest/concepts/publish-content-
guidelines

[6] see  https://developer3.oculus.com/documentation/publish/latest/concepts/publish-content-
guidelines/

"Oculus SDK", which is used to create "*OVR_*" and "*ovr_*" commands and data structures.  It is believed that the OVR/ovr versions of the commands signal the hardware compiler that the target device is a product manufactured by the Defendants or conforming to the Defendants' requirements.

          c)      Oculus Rift "stor[es] a videogame image in the first buffer," as required by Claim 16, such as through the use of Microsoft's DirectX API and related libraries including, but not limited to, the D3D or DirectX3D libraries that are subsets of the larger DirectX platform.  The "*Oculus SDK Developer Guide 1.10.1*" provides examples of the texture swap chain creation that is typically used for 3D rendering:

      *ovrTextureSwapChain textureSwapChain = 0;*

      *std::vector<ID3D11RenderTargetView*> texRtv;*

The "*ovr*" prefix indicates that the command is for the Oculus Rift product.  The "*textureSwapChain*" is program code to indicate that a 3-dimension image will be created using multiple memory buffers:

      As a simplified overview, a video may be envisioned as a series of 2-dimensional images or frames that are displayed sequentially, similar to the frames of a common video motion picture. In order to create a 3-dimensional effect, different frames are shown to the left eye and the right eye.  The frame images superficially appear very similar, but have an offset to allow for stereo-vision (i.e., each eye sees the same image but from a slightly different angle to create a 3-dimensional effect).  In an exemplary system described herein only for purposes of illustration, typically the *first* frame of a video is displayed to the *first* eye only *after* it has been rendered (i.e., created or stored) in a *first* memory location; while the *first*

frame data is being transferred to the display for the *first* eye to view, a *second* video frame is being rendered to a *second* memory location.  After the *first* frame has been displayed, the *second* frame data from the *second* memory location is transmitted for display to the *second* eye.  While the *second* frame data is being transferred for display to the *second* eye, the next frame is being queued up in the *first* memory location for display to the *first* eye.  A long string of frames (e.g., from 60 to 120 frames per second), is typically used in any virtual reality videogame or 3D movie.  The continual swaps between the first and second memory buffer content for display to the left and right eyes is commonly referred to as a "*SwapChain*".  Videogame and 3D video programmers may enhance system performance with the addition of front- and back- memory buffers, thereby creating Left-front, Left-back, Right-front and Right-back memory buffers.  The additional buffers function in a SwapChain manner, however they allow for increased image creation speed (i.e., higher frame rates) and a more realistic image.  There are also other variations that use even more memory buffers or other GPU resources, however the fundamental function remains consistent.

"*ID3D11RenderTargetView*" indicates that DirectX 3D Version 11 will be the language used to render the image.

d)      Oculus Rift "determin[es] when the videogame image is a two-dimensional image or a three-dimensional image," such as the DirectX commands that retrieve the Boolean logic values indicating whether the videogame system is two-dimensional or stereo-enabled (i.e., three-dimensional) [*the use of the term "stereo" means 3-dimensional in a video or*

*optical context; it should not to be confused with the audio context if the term that refers to two-speaker sound systems*].

   e)     If "the videogame image is a two-dimensional image, the videogame image is stored in the first buffer," the "mono or left eye view [buffer]."

   f)     If "the videogame image is a three-dimensional image," "a second camera position [is calculated]" for the second eye image (i.e., the offset between left and right eyes must be accommodated if the image is to look realistic).  In the Oculus SDK, programmers are taught that the camera angles for the typical flat-panel 3D display viewed at a distance in a consumer's living room are slightly different than the camera angles for the Oculus Rift, which is mounted a few fractions of an inch from the users' eyes.  Programmers may use regular DirectX3D commands or OpenGL commands to write their videogames; however, the Defendants *must* define new frame rendering modifications for more realistic viewing on the Rift or similar devices.  Furthermore, the Rift creates distortion due to the proximity of the displays to the eyes and this distortion requires additional processing when the typical SwapChain matrices are being calculated:

   *"The Oculus SDK makes use of a compositor process to present frames and handle distortion."*[7]

   *"To target the Rift, you render the scene into one or two render textures, passing these textures into the API. The <u>Oculus runtime handles distortion rendering</u>, GPU synchronization, frame timing, and frame presentation to the HMD."*[8]

   *"The Oculus Rift <u>requires split-screen stereo</u> with distortion correction for each*

---

[7] Oculus Rift Developer Guide Version 1.10.1

[8] Oculus Rift Developer Guide Version 1.10.1

*eye to cancel lens-related distortion."*[9]

The DirectX software may be used to "create and set stereo projection matrices," *in accordance with the Defendants requirements*, wherein the camera parameters are set and the stereo projection matrix is updated and matrices are transposed to calculate the right eye (stereo) view.

g)   Also, when the videogame image is a three-dimensional image, Oculus Rift "stor[es] the second camera position view image in the second buffer," such as in the examples provided with the DirectX software libraries, the right view may be rendered  in the back buffer of a SwapChain, where such back buffer of the SwapChain is obtained as a DXGI resource or similar hardware resource.

h)   Further, when the videogame image is a three-dimensional image, the Oculus Rift  "simultaneously display[s] the images in the first and second buffers to create a three dimensional perspective of the image to the user," such as the DirectX software program using a "Present()" call that will cause the image in the buffer to be transferred to the display screen.

i)   Additionally, the same steps described above may be performed by the Oculus Rift product controlling the manner and timing of other videogame development system libraries, such as in the use of the Open Graphics Library ("OpenGL") specification API for rendering of three-dimensional graphics on, for example, Defendants' Oculus Rift.

31.   Plaintiff TVIP respectfully asserts that the discussion in the paragraphs above of the exemplary infringement of exemplary Claim 16 of the '096 Patent is intended to provide Defendants with adequate and reasonable notice of the nature and factual basis of the patent

---

[9] Oculus Rift Developer Guide Version 1.10.1

infringement allegations made against it in the Complaint regarding an exemplary claim, pursuant to counsel to Plaintiff TVIP's best understanding of the current Courts' interpretations of the patent infringement notice requirements.  Pursuant to continuing discovery and patent term construction law, Plaintiff TVIP reserves all rights to further discuss, define, and construe its construction of any patent terms discussed above in the exemplary description of Defendants' infringement of Claim 16 of the '096.  Further, the above discussion is intended to give Defendants reasonable notice of the facts of the infringement in a non-technical and generally understood manner and it is not intended as a limitation on Plaintiff's construction of any terms of the '096 Patent for Plaintiff's formal infringement contentions as those terms may latter be considered by this Court in a *Markman* hearing or in another claim construction consideration.

32.    By the service of this lawsuit, Defendants are placed on actual notice of their infringement of the '096 Patent, and to whatever extent Defendants continue their infringing activities, Defendants also infringe the '096 Patent in violation of 35 U.S.C. § 271(a) by infringement, either direct or indirect, after actual notice of infringement of the '096 Patent during the time period beginning from the date of service of this Complaint, the date of actual notice, and are liable for any and all such damages as of such service.

33.    Further, at least in accordance with the *SCA Hygiene Products v. First Quality Baby Products,* (S.Ct. No. 15-972, March 21, 2017),[10] Plaintiff TVIP alleges infringement by Defendants in the period of time preceding the filing of this lawsuit in which Defendants infringed the '096 Patent in violation of 35 U.S.C. § 271(a) by infringement, either direct or indirect.

34.    To the extent Defendants continue to infringe the '096 Patent after service of this

---

[10] see https://www.supremecourt.gov/opinions/16pdf/15-927_6j37.pdf

Case 1:17-cv-00386-UNA   Document 1   Filed 04/06/17   Page 16 of 18 PageID #: 16


Complaint, Defendants further infringe the '096 Patent in violation of 35 U.S.C § 271(b) by inducing infringement of the '096 Patent, whereby Defendants condition beneficial use of their products on participation in a videogame system that may or may not incorporate components from third-parties, and that Defendants control the manner and timing in which such third-party components may be used to perform or manufacture the infringing methods and products, and that Defendants benefit financially by exerting such control over the third parties.

35.     To the extent Defendants continue to infringe the '096 Patent after service of this Complaint, Defendants further infringe the '096 Patent in violation of 35 U.S.C § 271(c) by contributorily infringing the '096 Patent, whereby Defendants offer to sell a material component of an infringing system and whereby such material component has no substantially non-infringing use.

36.     Plaintiff TVIP is entitled to recover from Defendants damages as a result of Defendants' acts of infringement of the '096 Patent at least from the date of service of this Complaint, with damages in amounts subject to proof at trial, and, with the consent of the Court, for up to six years prior to the date of service of this Complaint.

<u>**REQUESTED RELIEF**</u>

**WHEREFORE**, Plaintiff Techno View IP, Inc. prays for judgment against Defendants Oculus VR, LLC and Facebook, Inc., jointly and severely, for the following relief:

A.     A judgment declaring that Defendants infringed the '096 Patent;

B.     an accounting for damages under 35 U.S.C. § 284 from Defendants for infringement of the '096 Patent;

C.     a judgment awarding Plaintiff compensatory damages as a result of Defendants' infringement of the '096 Patent, together with interest and costs, and in no event less than a

reasonable royalty;

      D.      a judgment declaring that Defendants' infringement of the '096 Patent has been willful and deliberate;

      E.      a judgment awarding Plaintiff treble damages and pre-judgment interest under 35 U.S.C. § 284 as a result of Defendants' willful and deliberate infringement of the '096 Patent;

      F.      a judgment declaring that this case is exceptional and awarding Plaintiff its expenses, costs, and attorneys' fees in accordance with 35 U.S.C. §§ 284 and 285 and Federal Rule of Civil Procedure 54(d);

      G      an accounting for damages under 35 U.S.C. § 271(a) and/or 35 U.S.C. § 271(b) or 35 U.S.C. § 271(c) from Defendants for intentional active inducement of infringement of the '096 Patent, or contributory infringement from the date of actual notice of the patent infringement through the patent's expiration or, with the Court's consent from the period including six years prior to the date of actual notice, if either patent expires during the pendency of this Lawsuit, and an award of damages ascertained against Defendants in favor of Plaintiff, together with interest and costs thereon; and,

      H.      such other and further relief to Plaintiff and against Defendants as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff Techno View IP, Inc. demands a trial by jury of all issues properly triable by jury in this action.

Respectfully submitted,

**O'KELLY & ERNST, LLC**

Dated: April 6, 2017

*/s/ Sean T. O'Kelly*
Sean T. O'Kelly (No. 4349)
Daniel P. Murray (No. 5785)
901 N. Market Street, Suite 1000
Wilmington, DE  19801
(302) 778-4000
(302) 295-2873 (facsimile)
sokelly@oelegal.com
dmurray@oelegal.com

*Attorneys for Plaintiff Techno View IP, Inc.*